## BRABHAM v. CROSLAND.

1. The conduct of guardians and others dealing with Confederate currency must be reviewed in the light of the then surrounding circumstances, when such currency was recognized as the only medium of exchange.

2. The Circuit Judge sustained in his findings of fact based upon the conflicting testimony of witnesses examined before him.

3. Testator directed his estate to be kept together until two crops were made, and then divided, the income to be applied meantime to certain purposes. The executor, to avoid a sacrifice of one of these crops, collected an *ante bellum* note and applied the proceeds to such purposes, and afterwards sold the crop at a considerable advance, and made division at the time appointed. *Held*, that he was not liable for collecting this note in Confederate currency in advance of the time for division.

4. A guardian may be liable for calling in good investments when an executor would not be; for it is the duty of the former to keep his funds invested, and of the latter to collect and administer.

5. If the conclusion of the Circuit Judge be correct, it is not material to consider the reasons which led him to such conclusion.

6. Money decreed in 1862 to be paid presently to minors for equality of partition was payable in Confederate currency.

7. Where a guardian charged himself with money ordered to be paid by his wife for equality of partition, and invested it in Confederate bonds, the ward by suing on the guardianship bond elected not to follow the lien on the land, and, the investment being sustained, the accountability of the guardian is discharged. The investment in Confederate bonds, if justified, would be payment, and the lien on the land released.

8. Where money is ordered to be paid to an infant presently for equality of partition. the guardian is bound to receive the money, and is not thereby chargeable with calling in an investment secured by a lien on real estate.

9. The guardian is not liable for receiving such money in advance of the confirmation of the return in partition—the return having been afterwards confirmed.

10. The vesting of the ward's share in her grandfather's estate, under the terms of his will, was not postponed until her majority or marriage; and the executor properly paid to himself as guardian and invested her share of said estate. But even if not vested, it would have been his duty as executor to invest the funds eventually coming to her.

Before FRASER, J., Aiken, April, 1885.

This was an action by R. C. Brabham, as administrator of Zilphia E. Brabham, his wife, against James E. Crosland and the sureties on his bond, for an accounting of his administration of the estate of his ward, the said Zilphia. The action was commenced in June, 1884.

The Circuit decree was as follows :

As I understood the argument of the counsel for plaintiff, who closed the case at the hearing, the administration of the guardian is questioned now only in reference to the special matters to be hereinafter considered, and that as to all else the alleged investments in Confederate bonds will not be challenged. I think this is a very proper view of the case, and will take up these special matters *seriatim*.

1. It is claimed that on December 19, 1863, the guardian invested $12,000 of his ward's money in a tract of land purchased by him from Winchester Graham, and known as the "Stallings' Place"; that he took the title in his own name and afterwards allowed the same to be sold by the sheriff as his own and to pay his own debt. If such an investment had been made, the guardian and his sureties would be liable either for the amount paid and interest on it, or for the value of the place and the rents and profits. George H. Bush, one of the witnesses for the plaintiff, says distinctly and positively that Crosland told him that he had put this ward's money into this tract of land. Crosland denies positively that he ever made any such statement, and denies that he ever made any such investment, and says that he bought the property and used it for himself.

There may have been some misapprehension on the part of the

witness as to what was said, but there can be no misapprehension on the part of Crosland as to what he did. If he made such an investment, it is scarcely in the range of probability that he has forgotten it; and if he has not told the truth, there can be little excuse for not doing so. The plaintiff had a right to put his character in issue, and he has not done so. The testimony of Mrs. Amanda M. Bush is too shadowy. She says that she heard Crosland tell his ward when quite a child about this land being for her. She *"thinks"* it was *at his house*, but can't tell whether it was *"before or after the war."* May she not have heard this from some one else? The conversation with J. H. Bush when this land was about to be sold by the sheriff under an execution against Crosland, I think, tends to confirm his statement. When a claim that such an investment was made was suggested as a means of saving the lands from sale by the sheriff, he said that he had money of his own, and of these two estates, and he could not say he put the estate money in the land. Nothing was said about Zilphia, but the question was about his "ward," or his "wards." The language of the witness is this: "I don't think he said 'estate,' but he said he couldn't say whether it was his ward's money or not, and that he had money enough of his own." The testimony shows that about this time the guardian did have money of his own and of his ward's on hand, and of his own ample to make that purchase.

The guardian had no right to make any such investment, and he must have known, even then, that whatever may have been the law as to investment in Confederate bonds, he made purchases of land with his ward's money at his own risk. If he bought this property with his ward's money and *told it to her friends*, it is not probable that he would have used it openly as his own, as he certainly did do from the time of the purchase. I have therefore come to the conclusion as a matter of fact that the guardian, Crosland, did not use his ward's money, but his own, in the purchase of the Stallings' Place.

2. On January 7, 1863, there was a large sale of personalty of the estate of Isaac Bush and the share of the ward turned over to the guardian by himself and his co-administrator. In December, 1862, and January, 1863, in pursuance of the terms

of the will there were sales of real and personal property belonging to the estate of David Bush, and the share of Zilphia was transferred by the executor, Crosland, to his account as guardian. There were other sales of both estates, but not mentioned here, as I do not understand that any funds arising from any of these sales are now claimed, if they were in fact invested in Confederate bonds, and even that, except as to the "Stallings' Place," seems to be admitted. I am satisfied, from all the testimony before me, that all the moneys which came to the hands of the guardian during the war were invested in Confederate bonds, and if he was guilty of any default, it was not in investing, but in receiving Confederate money for sums secured to his ward by liens on real and personal property, and growing out of the partition of the estates of Isaac Bush and David Bush.

The returns of the commissioners appointed by the Court of Equity to make partition of the estate of Isaac Bush was dated January 22, 1863, and by it the sum of $4,642.62⅔ was charged in favor of the ward in the share of her mother, Mrs. Amanda M. Bush. She and the ward were the only distributees of the estate, and either in settlement or in cash on the day of partition, or very soon thereafter, Mrs. Amanda M. Bush paid to the guardian the said sum of $4,642.62⅔ in Confederate money. The testimony in the case convinces me that all the transactions in reference to both of these estates in the latter part of 1862, and thenceforth until the close of the war, were in reference to Confederate money, the only currency then in use in this State. If the guardian had sold land, or if he had received Confederate money on an *ante bellum* claim, which was unquestionably due in legal tender, and well secured, then I do not see how, under the rulings of our Supreme Court, the guardian and his sureties could escape liability.

This, however, is a claim which originated during the war, and grew out of a proceeding in court having jurisdiction of the parties and of the subject matter, and stands on a different footing from any of the cases heretofore decided in this State and in which trustees were held liable for collecting and investing in Confederate securities bonds which were well secured and made before the Confederate war. I do not see that it can affect this

case, that the order confirming the returns to the writ of partition was not made until February 3, 1864, and after the investment was made by the guardian. In *Huson* v. *Wallace* (1 *Rich. Eq.*, 1), the marital rights of a husband were held to have attached to the personal property of his wife, who died between the date of the returns and the order of confirmation. In *Jackson* v. *Jennings*, this point did not arise, for in that case the death of the slave occurred before the returns were made. 13 *Rich. Eq.*, 172.

If, however, we assume that the partition was not complete until February 3, 1864, as in case of the commissioner in the *State* v. *Norris* (15 *S. C.*, 241), the order of confirmation was sufficient to make good the receipt and investment of money which had already come to the hands of the guardian, even if by some misapprehension of his duty he had received it before the date of the order. It is true, that trustees are not allowed to deal with trust funds in all respects as prudent persons may deal with their own. They hold these funds for investment and collection and reinvestment from time to time in good interest-bearing securities. They can invest in real estate bonds, in well secured personal bonds, and in government securities, and where a particular investment is prescribed by the terms of the trust they must follow the instructions. Where none of these can be obtained, a trustee is required to act as a prudent man would with his own.

The trustee in this case has accepted in payment the note of the government under which he lived and to which he rendered obedience, a government which the State of South Carolina, whose law prescribed his liability and duty as trustee, then, and always before, and while in existence held to be a rightful government, not only *de facto* but *de jure*. It was the only currency and was at that time of unimpaired credit, received by business men and the banks of the State and even by the officers of the court which appointed him guardian, and so received with the consent and in accord with the practice of the court at that time. This, then, being a case of obligations arising during the war and out of proceedings in the Court of Equity, and not of the guardian's own volition, and in which I think the transactions were in reference to Confederate money, I think that the guardian had a right to receive the money. While there is no direct

evidence except that of the guardian himself as to the basis of valuation, yet every article which was sold at that time, belonging to these two estates, where we have any testimony on this point, was valued in reference to the currency, and I cannot with any good reason escape the conclusion that this land was valued in the same way.

3. The commissioners appointed under the will of David Bush and in strict compliance with the terms of his will, on December 15, 1862, assigned to Mrs. Crosland, the wife of the guardian, James E. Crosland, lands, the "Harvey" or "Red Hill tract," and slaves, and charged on them in favor of his ward $2,-490.63, and also a large sum in favor of other legatees under the will. This is also an obligation arising during the war, and in the regular course of administration, and not by the mere volition of the guardian who was the executor of the estate. In addition to the other considerations which induce me to conclude that the valuation of the land was in reference to Confederate currency, one of the commissioners testifies that such was the basis of valuation.

I am by no means certain that there has ever been any payment of this sum by Mrs. Crosland. There is no proof of any separate estate and of its appropriation to this purpose by any competent authority. As to all personal property coming to her from the estate of her father, David Bush, or any other source, the marital rights attached as soon as reduced to the possession of her husband. He certainly had no right to discharge this lien by charging himself with the amount. If it had been his own debt, the law would have presumed payment to himself in his new capacity as guardian. It was only a lien on the land, and he could make no bargain with his wife in reference to this or any other matter. If this view be correct, then as to this amount there never has been any receipt of the money, and he never had so much money to invest. If, however, the guardian had a right to discharge this lien by the charge made against himself in his accounts and returns in January, 1863, this matter stands as the above payment made by Mrs. Amanda M. Bush, and in both cases the collections and investment must be sustained.

4. If the notes of Dunbar, MacElhenny, and Wood belonging

to the estate of David Bush, which had been charged by James E. Crosland to himself as executor, had never in fact been paid, it may be that he would still be liable for the amounts under which he charged himself, and also his sureties, as guardian for his ward's share of them. If, however, the notes, or any part of them, were collected afterwards in good money, he is liable for the amount, and would be even if he had paid over the amount of them in Confederate money to another trustee. I think that he ought to account to the estate of his ward for her share of any money received on these or similar notes. The guardian and his sureties are also liable for any sums received as rent of the ward's land since the war. The ward's estate must account for all rents received for the "Red Hill" tract, held under the proposed compromise, and for any amounts she agreed to pay for surveying, and also for all money paid to her since the war.

It is therefore ordered and adjudged, that the defendant, James E. Crosland, and his sureties, do account before W. W. Williams, the master, for all money received by him as rent of the ward's land since the war, and for her share of any money received since the war on the notes of Dunbar, MacElhenny, and Wood, and any other notes of the estate of David Bush, deceased, which were in fact not paid, but charged to James E. Crosland as executor, and that the estate of the ward account for the rents, use, and occupation of so much of the "Red Hill" tract as was held under the proposed compromise, and for all money received by the ward from the guardian since the war; and it is ordered and adjudged that said accounting, when made and confirmed by the court, shall be in full of all demands in favor or against either guardian or ward, arising out of said guardianship. It is ordered that the defendant, James E. Crosland, pay the costs of the minors, and that as to the plaintiff and other defendants each party pay his own costs, and that any costs to accrue hereafter abide the further order of the court.

From this decree plaintiff appealed upon the grounds stated in the opinion.

*Messrs. G. W. Croft* and *P. A. Emanuel*, for appellant.

*Messrs. Henderson Bros.* and *John J. Maher*, contra.

October 12, 1886.  The opinion of the court was delivered by

MR. JUSTICE McIVER.  By this action the plaintiff, as administrator of the deceased ward, demands an account of her estate from her guardian, Crosland, and his co-defendants, sureties on the guardianship bonds.  Owing to the fact that one of the defences was in the nature of a plea in bar to the accounting demanded, it became necessary for the Circuit Judge first to determine the issue raised by that defence before any accounting could be ordered, and thus having the case before him he proceeded to determine all the issues involved, without any accounting before the master or a referee.  The Circuit Judge, therefore, heard all the testimony in open court, as to the various questions presented, and his conclusions as to the facts were based upon the testimony so heard, and not as reported by the master or a referee.  The defence in bar of the accounting having been overruled by the Circuit Judge, to which ruling no exception has been taken, no further notice need be taken of it. We will therefore confine our attention to the several matters presented by the exceptions to the Circuit decree.

The guardian in his answer admits that he received a large amount of money, something over twenty thousand dollars, for his ward, but that it was all in Confederate money and was invested by him in Confederate bonds, except some small amounts which came to his hands after the close of the "war between the States," but as the decree requires him to account for all money received since the war, and there is no appeal from that part of the decree, we may dismiss that from our minds and devote our attention to the transactions of the guardian during the war.

It appears that in January, 1863, the defendant, Crosland, was appointed guardian of plaintiff's intestate and duly qualified as such.  The estate of his ward was derived from two sources—the estate of her father, Isaac Bush, and the estate of her grandfather, David Bush.  The former died on January 11, 1860, and the defendant, Crosland, with one Edward B. Bush, administered on his estate; the latter died on November 3, 1860, leaving a will, of which the defendant, Crosland, was the sole executor.  It is admitted in the "Case" that the personal estate of Isaac Bush was sold by his administrators under an order from the ordinary

of Barnwell County, and that on January 7, 1863, the share of the ward, amounting to upwards of twelve thousand dollars, was received by the guardian, "the only question being as to whether he did invest this amount in Confederate bonds." The ward was also entitled to receive from her mother, Mrs. A. M. Bush, the further sum of something over four thousand dollars, which, upon the partition of the real estate of Isaac Bush, Mrs. A. M. Bush was required to pay to the ward for equality of partition; and this sum also the guardian claims to have received on January 7, 1863, but this is denied by the plaintiff, and is one of the points of controversy in the case. As to the estate of David Bush, the defendant, Crosland, claims that he, as executor, settled up that estate, and paid himself, as guardian of Zilphia E., the sum of twenty-three hundred and thirty-five dollars, her share thereof, on January 7, 1863, and that the further sum of twenty-four hundred and ninety dollars, which was directed to be paid to the ward by Mrs. Crosland, the wife of defendant, Crosland, for equality of partition, was also paid to him and by him charged on his account as guardian on January 7, 1863; but this likewise is denied by the plaintiff and constitutes another point of controversy.

The plaintiff, on the other hand, in addition to the points of controversy already mentioned as to the two amounts to which the ward was entitled on the partition of the two estates of Isaac Bush and David Bush respectively, contends that the guardian did not receive in Confederate money large amounts which he claimed to have received in that currency, but, on the contrary, that he received them in good money; that certain other amounts were improperly received by him in Confederate money; that there was no sufficient evidence that any part of the ward's estate was invested in Confederate bonds, and that, on the contrary, a large amount thereof was invested in the purchase of a tract of land, known as the Stallings place, for which the guardian took title in his own name on December 19, 1863.

The Circuit Judge found as a matter of fact that all the money which came into the hands of the guardian during the war was invested in Confederate bonds; that all the transactions of the guardian, in reference to both of the estates above mentioned in

the latter part of 1862, and thenceforth to the close of the war, were in reference to Confederate money, the only currency then in use in the State, and that the guardian had a right to receive the amounts above stated as coming to the ward in that currency; that as to the amount which the wife of the defendant, Crosland, was directed to pay to the ward for equality of partition, he was "by no means certain that there has ever been any payment of this sum by Mrs. Crosland;" but he held that if it had not been paid, it was still a lien upon Mrs. Crosland's land, for which the guardian and his sureties would not be responsible, and if it had been paid, then it was paid and properly paid in Confederate money and the amount invested in Confederate bonds, and therefore the guardian was not now liable for it; and that the testimony satisfied him that the guardian did not use the ward's money in the purchase of the Stallings place.

From so much of the judgment as is stated above the plaintiff appeals upon the following grounds:

"1. Because the evidence shows that the Stallings place was bought by James E. Crosland with the money of his ward, Zilphia E. Bush, and his honor erred in not so deciding.

"2. Because from the evidence it appears that the defendant, James E. Crosland, collected a large part of the money coming to his ward from the estate of David Bush in good money, and it was error in the presiding judge in not so deciding—among other debts and money collected, especially the note of Bothwell.

"3. Because it appears from the evidence that the defendant, James E. Crosland, collected in good money from the sale of the effects of the estate of David Bush and also from the sale of the effects of the estate of Isaac Bush large sums which were in part the estate of his ward, and his honor erred in not so deciding.

"4. Because there was no satisfactory evidence that the defendant, James E. Crosland, invested his ward's money in Confederate bonds, and his honor erred in finding that he had done so.

"5. Because there was no evidence that James E. Crosland and his wife had paid to the defendant, and as guardian, the amount coming to his ward for equality of partition in the real estate of David Bush, and it is further submitted that said amount being well secured by a lien upon real estate, and there being no neces-

sity for the guardian to collect the same, the guardian would not be justified in making such collection, especially as the transaction, if allowed, would be in his own interest and against the interest of his ward's estate, and it is therefore submitted that his honor erred in allowing said guardian credit for said sum as if paid in Confederate money.

"6. Because it is submitted that if the lien upon Crosland and his wife's land was satisfied by payment, Crosland uniting in himself debtor to and guardian of his ward, such lien if satisfied was by presumption of payment, and the law presumes payment only in good money, and it was error in his honor not so deciding.

"7. Because the amount coming to the ward, Zilphia E. Bush, for equality of partition of the estate of Isaac Bush was well secured by a lien upon real estate, and there being no necessity to collect such sum, the defendant, James E. Crosland, was not justified in collecting such debts, and the defendant should therefore have been held liable for the same, and it was error in his honor not so deciding.

"8. Because it appears from the testimony that the defendant, Crosland, did not and could not have had in his hands the funds coming to his ward from equality of partition of the estate of Isaac Bush at the time he alleges that he invested the same in Confederate bonds, and it was error in his honor not so deciding."

It will thus be seen that this is another of those numerous cases which have been presented to the courts since the war, in which the transactions of guardians and other trustees during that period, when everything was in an abnormal condition, have been sought to be impeached. As has been well said in several cases, whenever we are called upon to review such transactions, it is not only important, but absolutely essential, that we should, as far as practicable, transport ourselves back to those troublous times, and look at the conduct of parties in the light of the circumstances by which they were then surrounded. See especially the very just and pertinent remarks of the present Chief Justice in the case of *Wilson* v. *Braddy*, 16 *S. C.*, at page 521, and in the case of *Hyatt* v. *McBurney*, 18 *S. C.*, at page 213. We must remember that Confederate currency was the only money in use, the only medium of exchange; that it was universally so

recognized and treated not only by the people in their individual transactions, but by the government itself in all its departments. It was received in payment of taxes, it was received in payment of purchases made under the orders of the courts, and investments in the bonds of the government which issued it were authorized by statute and by the orders of the courts. We know that it is very difficult, after this lapse of time, even for those who were personally cognizant of the condition of things in this country during the war, to carry their minds back and look at a transaction *then* occurring solely in the light of the *then* surrounding circumstances, uninfluenced by the light of subsequent events. But to avoid injustice to those whose conduct during that period we are called upon to review, we must, as far as practicable, do so. Passing from, but not forgetting, these general considerations, which the nature of the case gives rise to, we propose to consider the several questions raised by the grounds of appeal.

The first, second, third, and fourth grounds present questions of fact only, and under the well settled rule of this court it is only necessary to inquire whether the conclusions of the Circuit Judge assailed in these grounds are without any evidence to sustain them, or are manifestly against the overbearing weight of the testimony. In considering this question it is important to bear in mind that the testimony was taken in open court, thus affording the Circuit Judge a full opportunity of both seeing and hearing the witnesses and observing their manner while under examination. This circumstance, always important, is peculiarly so when, as in this case, there is a conflict of testimony.

As to the issue raised by the first ground, it is quite clear that the testimony is, in one sense, conflicting, though possibly reconcilable with the theory that all of the witnesses intended to tell the truth. Crosland testifies positively that he paid for the Stallings place with his own money, and there is other testimony tending to show that he had at the time means of his own sufficient to enable him to make the purchase. The testimony relied upon to controvert Crosland's positive testimony are certain alleged declarations made by Crosland years ago to several witnesses. Now, when it is remembered how difficult it is for a witness to repeat the language used in a conversation occurring

years before, and how the change of a few words will sometimes alter the whole sense, we cannot say that there was any manifest error on the part of the Circuit Judge in adopting Crosland's version, especially when to do so would involve the necessity of discrediting entirely a witness whose character, so far as the testimony shows, is not open to impeachment.

As to the second ground, it is quite clear that the share of the ward in the estate of David Bush could not be ascertained, and therefore could not have been paid, until the settlement of that estate, which took place in January, 1863, when the only money in use was Confederate money, and therefore her share must necessarily have been paid in that currency. We understand, however, that the real point of this exception is, that Crosland, as executor, was chargeable with the money on hand at the death of his testator, and with all *ante bellum* notes, notably that of Bothwell, in good money, and that for his ward's share of such assets the guardian is chargeable in good money. Whether the propriety of Crosland's conduct as executor is open to investigation in the present proceeding might possibly admit of question; but waiving that, let us inquire whether he has committed any *devastavit*, such as is charged, of the estate of David Bush.

The testator, who was a person of large fortune, with a considerable family, died November 3, 1860, leaving a will, a copy of which is set out in the record, though it is too long to be inserted here. It is sufficient for our present purpose to say that the will manifestly contemplated a division and settlement of the estate two years after the death of the testator, or as it is expressed in the will, "after two crops shall have been gathered." In the meantime it provided that the estate should be kept together, "and the income, as far as necessary, applied to the education of my minor children, to the support of the gospel and charitable objects, and the maintenance of my wife and such of my children as shall continue to reside with her (whether such children be of age or not), and the families of such of my children, if any, who may be married and reside with my wife by her consent. My purpose being that my family shall continue, during that time, to live in the same style, enjoy the same privi-

leges, and make the same contributions to the gospel and charitable objects as heretofore."

This plainly involved the expenditure by the executor of a considerable sum of money for each of the two years. To meet these expenditures for the year 1861, the executor used the cash on hand at testator's death, the proceeds of the cotton made in 1860, and the proceeds of certain notes collected by him early in the year 1861, all doubtless good money, and for the year 1862, instead of selling the cotton made in 1861, he collected the note of Bothwell and the notes of two other persons, stating, in the return made for that year, as well as in his testimony in this case, that his reason for so doing was that cotton was then bringing a very low price, only seven cents a pound, which cotton was afterwards sold for eighteen cents in January, 1863. From this condensed statement of the acts of the executor we are unable to see where he has committed any *devastavit*.

Plaintiff clams that by the terms of the will he could only use the income to defray the expenditures provided for during the two years the estate was to be kept together, and that the *devastavit* was in collecting the notes of Bothwell and others, and applying the proceeds to such expenditures. But what damage did the estate sustain by reason of the fact that the executor used money derived from one source rather than another to meet expenditures which the will required him to provide for? On the contrary, was not the estate actually benefited to the extent of the difference between eighteen cents and seven cents per pound for the cotton made in 1861? The fact that these notes were *ante bellum* notes and therefore payable in good money cannot alter the case; for, as we have seen, the will contemplated a division of the estate at the expiration of two years from the death of the testator, and to effect this it would be necessary to collect the assets of the estate, and what possible difference could it make whether these notes were collected in 1862 or 1863, the time when the division of the estate was to be made under the terms of the will and when it was actually made? As we have said, the will manifestly contemplated a division and settlement of the estate at the expiration of two years from the death of the testator, and as he died in November, 1860, the two years would

expire in the latter part of 1862, and accordingly we find that the division was made on January 7, 1863, but a very short time after the expiration of the two years. Now, in order to effect this manifest purpose of the will, it was necessary to collect in the assets of the estate as preparatory to the division, and the fact that some of the assets were collected the year before for the purpose of avoiding a sacrifice of the cotton made in 1861, certainly could not be regarded as a *devastavit*.

It must be remembered that the duty of an executor is different from that of a guardian or other like trustee. The duty of the former requires him to collect in the assets of his testator's estate and administer them in accordance with the directions of the will, while the duty of the latter is to keep the funds of his *cestui que trust* securely invested. Hence, while it might be a breach of trust for a guardian or other like trustee to call in unnecessarily funds already well invested, and he might be made responsible for any loss occasioned thereby, the same rule would not apply to an executor, for the reason that the nature of their duties is altogether different. Any person interested in the estate of David Bush could, at any time after the expiration of two years from his death, have compelled the executor to divide the estate in accordance with the terms of the will; and to do this, he would have had to collect in the assets, which he could only do in Confederate treasury notes, that being the only currency in existence here at that time; and surely if he did voluntarily what he could have been compelled to do, he should not be charged with any default or breach of duty. We do not see, therefore, that there is any ground for the second exception in any view of the case.

As to the third exception or ground of appeal, which charges that the defendant, Crosland, collected large sums, in good money, from the sales both of the estates of Isaac Bush and of David Bush, we do not see how it can be sustained. In the face of the admission in the record at page 50, folios 195–6, we do not understand how such a claim can be made as to the estate of Isaac Bush, for there it is expressly admitted that the share of the ward in the proceeds of the sale of that estate was received by the guardian on January 7, 1863, and, therefore, certainly in Confederate money, and that the only question in reference to that matter

was whether the money so received was invested in Confederate bonds. As to the estate of David Bush, it is equally clear that there is no foundation for that exception. The sales of that estate, under the terms of the will, were made in December, 1862, and January, 1863, when Confederate money was the only currency in use.

The fourth exception raises a simple question of fact, and certainly there is no ground upon which we can be expected to reverse the conclusion reached by the Circuit Judge. There was positive and direct testimony that the ward's money was invested in Confederate bonds, and there was no positive and direct testimony to the contrary. All that is relied upon by the appellant to overthrow this conclusion of the Circuit Judge, seems to be certain alleged declarations of Crosland, tending to show that a part at least of the ward's money was invested in the Stallings place, together with all the circumstances of the case. The most that can be said is that the testimony and circumstances relied upon may raise a doubt as to the investment, but that is not sufficient to warrant us in reversing the conclusion of the Circuit Judge, especially in a case where there is a conflict of testimony.

The fifth and sixth exceptions are taken under a misconception of the decree of the Circuit Judge. We do not understand that he held either that the amount which Mrs. Crosland was directed to pay to the ward for equality of partition of the estate of David Bush, was actually paid by either Crosland or his wife, or that it was paid by operation of law by reason of Crosland uniting in himself the character of both debtor and creditor. On the contrary, the Circuit Judge rested his conclusion as to this matter upon an alternative view of the subject, without designating which alternative he adopted. As we understand his decree, his view was that this money was either paid, or it was not paid. If it was paid, then it was to be regarded as paid in Confederate money, just as he had previously held in reference to a similar debt due by Mrs. Amanda M. Bush, and the collection and investment should be sustained. But if it has not been paid, then it still remains a claim on Mrs. Crosland, secured by a lien upon her land, and the guardian is not chargeable therewith.

It is not important for us to determine whether the consider-

ations which influenced the mind of the Circuit Judge in reaching his conclusion are correct, but the vital point is whether such conclusion is correct. We think it is. This claim originated during the war, and grew out of the settlement of an estate made during that period. The Circuit Judge has found as matter of fact, "that all the transactions in reference to both of these estates, in the latter part of 1862, and thenceforth until the close of the war, were in reference to Confederate money, the only currency then in use in this State;" and such, we have no doubt, was the understanding of all the parties concerned. The commissioners appointed under the will of David Bush to make partition of his lands and slaves, made their return on December 15, 1862, and in it they recommended a sale of a portion of both the land and slaves *for cash,* which, of course, could only have been in Confederate money, and that the proceeds of such sales should be divided amongst the minor children. It is scarcely possible to suppose that they intended that these minors should receive their shares in Confederate money, and that those to whom sums of money were awarded for equality of partition should be entitled to claim payment in gold. It is to be observed, also, that these sums were not directed to be paid at a future time—no credit given—as might have been done if such had been the intention; but they were payable presently, that is, in cash, and therefore necessarily in Confederate money, as none other was then in use. We conclude, therefore, that this debt due to the ward by Mrs. Crosland for equality of partition was an obligation arising during the war; that it grew out of the settlement of an estate made during that period in reference to Confederate money; that being payable presently, it could be paid in Confederate money.

Was it paid? There is no evidence going to show that it was paid by Mrs. Crosland; but that is immaterial, if it appears that it was actually paid by any one. The fact that Crosland charged himself in his account as guardian, while it would not extinguish the lien on Mrs. Crosland's estate by which it was secured, might make him and his sureties chargeable with the amount. So, too, if the debt be regarded as Crosland's own debt and not that of his wife, the fact that he united in himself the character of both debtor and creditor would not operate as such payment as would

extinguish the lien on the land, though, possibly, it might make Crosland and his sureties liable to account for the amount. But in either event, the ward or her representative could have the election either to pursue the guardian and his sureties, or to claim the benefit of the lien. By this action the plaintiff has elected to pursue his remedy on the guardianship bond, and his claim must be based either upon the fact that the guardian received the money and has not accounted for it, or upon the fact that the debt has been lost by reason of the inexcusable negligence of the guardian in collecting it. If the former be regarded as the basis of the claim, then, as we have seen, the money has been accounted for by its investment in Confederate bonds. If, however, the latter be regarded as the basis of the claim, then there is no evidence that the debt has been lost. So that in neither view has the plaintiff established this claim against the defendants.

In addition to this, it seems to us that the testimony shows actual payment of this debt, and not payment by operation of law merely. According to the testimony of Crosland, the whole amount of his ward's estate, with which he has charged himself in his returns, including this identical amount now under consideration, was invested in Confederate bonds, and the Circuit Judge finds this to be the fact. Now, if this be so, unquestionably this amount must have been paid before it could have been invested in Confederate bonds. Suppose Crosland, with a view to relieve his wife's land from this statutory lien, had invested the amount in an unquestionably good bond, secured by a mortgage of real estate, and when called upon to account as guardian had produced such bond and mortgage as a part of the assets of his ward's estate, would not this have been regarded as payment of the amount which his wife was ordered to pay to the ward for equality of partition, and would not the lien upon his wife's land have been extinguished thereby? This is practically what has been done, for instead of accounting for the amount in a personal bond secured by a mortgage of real estate, he accounts for it by an investment in Confederate bonds, which, if justified, as we have seen that it should be, is the same thing in principle, and should have the same effect.

What has been already said applies with increased force to the

question raised by the seventh ground of appeal, for there it cannot well be disputed that the amount which Mrs. Amanda M. Bush was ordered to pay to the ward for equality of partition of the estate of Isaac Bush was actually paid to the guardian in January, 1863, and of course paid in Confederate money. Such is the testimony of Crosland, which is fortified by the receipt of Mrs. Bush to the administrators for her distributive share of the estate, bearing date the same day as the return of the commissioners in partition. It is a mistake to regard this as *an investment* of the ward's funds secured by a lien on real estate, which it was improper for the guardian to call in, unless there was a necessity for it, which is not pretended to have been the case. This claim due the ward arose out of the partition of her father's estate, made under proceedings in the Court of Equity in 1863, the very object of which was to enable the heirs to enjoy in severalty their respective shares of the estate. This Mrs. Bush could not do until she had paid the amount decreed to be paid by her to the ward for equality of partition, for, until such payment, her title to the property allotted to her would not vest in her (*Burris* v. *Gooch*, 5 *Rich.*, 1); and thus one of the main objects of the partition would have been defeated. It was a debt originating during the war, and payable presently; not on a credit, which might have been provided for if such had been the intention. All the transactions in reference to this estate, as found by the Circuit Judge, were in reference to Confederate money, and, therefore, the guardian had a right to receive payment of this debt in that currency.

The point of the eighth exception, as we understand it, is that, as the order for the confirmation of the return of the commissioners appointed to make partition of the estate of Isaac Bush was not signed until February 3, 1864, it was impossible that the guardian could, prior to that time, when he claims to have invested this amount in Confederate bonds, have had in his hands the amount which, by that return, Mrs. Bush was directed to pay to the ward for equality of partition, and, therefore, he could not have so invested this amount. We agree with the Circuit Judge that there is nothing in this point. It may have been somewhat irregular for the guardian to have received the amount before the

return was confirmed; but as there were but two parties interested in the partition—Mrs. Bush and her daughter, the ward—the person paying and the person receiving the money, there could hardly have been much risk in anticipating the confirmation of the return. But however that may have been, the fact is that the return was confirmed, and that ended the matter.

Another question has been raised in the argument here, growing out. of certain provisions in the will of David Bush, for which we find no proper basis in the exceptions or grounds of appeal. It is contended in the argument here, that under the sixth and seventh clauses of that will the ward was not entitled to anything from that estate until she attained the age of twenty-one years or married, and that her interest was wholly contingent upon the happening of one of those two events, and that as neither of them occurred until long after the war—she having been married in 1876, and having attained the age of twenty-one years in 1880— her estate could not possibly have come to the guardian in Confederate money. So far as we can discover, this point does not seem to have been brought to the attention of the Circuit Judge, for he certainly has passed no judgment upon it, and there is, therefore, nothing before us to review. It is true that the counsel for the appellant state in the argument here that they brought this point to the attention of the Circuit Judge, "and he frankly declared his doubts as to the correctness of his judgment;" but upon turning to those folios of the judge's decree indicated in the argument of counsel, we find that Judge Fraser is there speaking of another matter altogether, viz., as to the fact of payment of the amount decreed to be paid by Mrs. Crosland for equality of partition, and whether such payment could arise by operation of law; but we nowhere find any allusion even to the question as to whether the interest of the ward under the will of David Bush was contingent or absolute; and we cannot suppose that so careful and conscientious a judge, in what is manifestly a well considered decree, would have either overlooked or ignored such a point. We must think, therefore, that counsel are mistaken in supposing that this point was brought to the attention of the Circuit Judge.

But as we may be in error in this, we will not decline to consider the point, even though not distinctly made in any of the

exceptions. By the fifth clause of his will, David Bush devises and bequeaths all the rest and residue of his estate "to my children and my grandchild, Zilphia E., the issue of any of them who may die before two crops shall be gathered, and who may be their distributees to represent their parents as in case of intestacy," &c.—going on to provide that certain advancements shall be accounted for. Then follow the sixth and seventh clauses, relied on by appellant, which read as follows:

"6th. I desire that my children, or those who take as their substitutes, shall take an absolute estate under any and all the provisions of this will in their behalf, when and not till they arrive at twenty-one years of age or marry ; and in case any of them shall die under age and unmarried, his or her property shall be divided between my then surviving children, the issue of children hereafter dying, who may be their distributees, to take their parents' share, as in cases of intestacy, the shares thus accruing to any one under age and unmarried to be subject to the same limitations over as the original shares.

"7th. If my grandchild, Zilphia E., shall die leaving no issue alive at her death, I desire that her devises and legacies be divided between my then surviving children. Such issue of deceased children, as may be their distributees, to take their parents' share, as in cases of intestacy ; but in case she shall *so die* after she becomes of age, or marries, then the original property and natural increase only (excluding the cash income) is to be accounted for to the limitees over."

There does not seem to be anything in either of these clauses to postpone the vesting of Zilphia E.'s interest until she marries or becomes of age, which is the basis of appellant's whole argument upon this point. That idea is drawn from the terms used in the sixth clause, which, by its express terms, applies alone to the *children* of the testator, or *their substitutes ;* and as Zilphia E. was neither a child nor the substitute of a child of the testator, that clause does not apply to her. This is conclusively shown not only by the use of the terms in that clause, "my *children or those who take as their substitutes,*" but by the further fact that after the testator had, in the sixth clause, made provision for what was to become of the shares of his *children* in certain con-

35

tingencies, he goes on, in the seventh clause, and, in very different language, makes provision for the disposition of Zilphia's share in the contingencies therein named; for while he provides, in the sixth clause, that his *children* are to take absolute estates "when and not till they arrive at twenty-one years of age or marry," there is no such language as that just quoted in the seventh clause, which deals with Zilphia's share alone. Why the testator should have made such a distinction, it does not concern us to inquire, though a reason might possibly be found in the fact of the extreme youth of Zilphia at the time—about one year of age—and the testator might have thought it unwise to postpone the vesting of her estate for such a length of time as must necessarily elapse before she would either attain the age of twenty-one years or marry.

But be that as it may, our sole province is to determine the intentions of the testator, by an examination of the words which he has used, and not to find reasons for the disposition which he has seen fit to make of his property. Here we find that the testator, after having previously provided that his whole estate shall be kept together until after two crops have been gathered, in the fifth clause of his will, gives the residue of his estate to his children and his grandchild, Zilphia, providing that if "any of them," that is, either of his children or his grandchild, shall die before the two crops are gathered, then the issue of the one so dying shall represent their parent—take as their substitutes. Then, in the sixth clause he makes certain provisions as to the shares of his *children*, or those who take as *their* substitutes; and in the seventh clause he makes certain other and different provisions as to the share of his grandchild. It is true, that in the seventh clause the share of Zilphia E. is limited over upon a certain contingency, which has never happened and cannot now occur, but this certainly could not have the effect of postponing the vesting of her estate. It seems to us, therefore, that the position contended for by the appellant cannot be sustained.

But even if we are in error in this, then Crosland as executor would have been compelled to hold the share of Zilphia E. as a sort of *quasi* trustee until the event occurred which would vest it in her; and if, as we have seen, all the transactions of this estate

were in Confederate money, then the investment of the fund so held in Confederate bonds would be sanctioned, as it was in the case of *West* v. *Cauthen,* 9 *S. C.,* 45.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.